Case 4:23-cv-03368   Document 59   Filed on 05/12/25 in TXSD   Page 1 of 15

United States District Court
Southern District of Texas
**ENTERED**
May 12, 2025
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAZMYN WASHINGTON, on behalf of herself and others similarly situated, | § § § § | |
| *Plaintiff*, | § § | |
| VS. | § | CIVIL ACTION NO. 4:23-cv-3368 |
| PBM ENTERPRISES, INC. a/k/a NOMAD, MOEED PARVEZ NAGRA, BASSAM P. NAGRA, and SOHAILA KAUSER, | § § § § § | |
| *Defendants*. | § | |

### ORDER

Pending before this Court is PBM Enterprises, Inc. a/k/a Nomad, Moeed Parvez Nagra, Bassam P. Nagra, and Sohaila Kauser's (collectively, "Defendants") Motion for Summary Judgment. (Doc. No. 39). Jazmyn Washington ("Plaintiff"), on behalf of herself and all others similarly situated, responded in opposition. (Doc. No. 43). Defendants filed a reply, (Doc. No. 45), to which Plaintiff filed a sur-reply, (Doc. No. 47). Having considered the motion, the summary-judgment evidence, and the applicable law, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

I.   **Background**

This is a purported Fair Labor Standards Act ("FLSA") collective action for Defendants' alleged failure to pay the minimum and overtime wages. Plaintiff is a former server at Defendants' establishment, Nomad, an upscale hookah bar. (Doc. No. 43-1 at 2). She began her employment with Nomad on or around August 14, 2022, and ended it on or around August 15, 2023. (*Id.*).

At the center of the dispute is the compensation structure of servers like Plaintiff. Plaintiff's affidavit states that she "was paid exclusively through tips customers would leave for [her]

service." (*Id.* at 3). According to her, she was allowed to keep (without recording or reporting to Nomad) any cash tips. (*Id.*). For credit card tips and automatic gratuities, however, they were recorded on a "close-out sheet" completed at the end of each shift. (*Id.*). The close-out sheet was then allegedly used to pool the tips and automatic gratuity and distribute them among the bussers, security personnel, DJs, and even the owner. (*Id.*). According to Plaintiff, the close-out sheets and cash tips were the sole methods of compensation, and she was not paid any hourly wages. (*Id.* at 2, 4). Moreover, Plaintiff claims that she "routinely" worked 45-55 hours per week but was not given overtime pay. Lastly, Plaintiff contends that Defendants operated an unlawful tip-pool without abiding by the requisite tip-pooling regulations.

In support of their motion, Defendants submit an affidavit of Nomad's Chief Operating Officer, Julie White, to contradict Plaintiff's version of events. White avers that "[s]ince its opening, Nomad has added a mandatory service charge onto customers' bills." (Doc. No. 39-2 at 2). "This Service Charge is and has always been a part of Nomad's gross receipts, or money that belongs to Nomad." (*Id.*). It "is mandatory and cannot be negotiated or changed by a customer." (*Id.*). These service charges—not tips—were then "pooled . . . at the end of the shift and/or the end of the day." (*Id.*). A portion of it was "deducted . . . to distribute to back-of-house staff" and the "remaining proceeds [were distributed] equally among servers who worked either the AM or PM shift or both shifts that day." (*Id.*).

For the alleged failure to pay minimum wage and overtime wages, Plaintiff brings several causes of action on behalf of herself and the purported FLSA collective: (1) failure to pay minimum wage pursuant to 29 U.S.C. § 206; (2) failure to pay overtime wages pursuant to § 207; (3) unlawful taking of tips in violation of § 203; (4) illegal kickback of wages in violation of 29 C.F.R. § 531.35;

and (5) retaliation in violation of 29 U.S.C. § 215. (Doc. No. 23). Defendants moves for summary judgment on all claims. (Doc. No. 39).

Notably, throughout the proceeding, both before and after Plaintiff's second amendment of her Complaint, several purported members of the collective action have filed their consent to join the collective action. The Court, however, has not yet certified a collective action, nor do an collective members' names appear as parties in the Second Amended Complaint.

## II.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant.

3

*Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

### III. Analysis

#### A. Failure to Pay Minimum Wage under 29 U.S.C. § 206

Title 29, United States Code, § 206 mandates that an employer pay its non-FLSA-exempt employees a minimum wage of $7.25 an hour. 29 U.S.C. § 206(a)(1)(C). The Fifth Circuit has not addressed whether, in applying the minimum wage provision, courts should use a weekly-wage standard (determining the rate by dividing the week's pay by the total hours worked that week) or an hourly-wage standard (requiring an employer to pay an employee the minimum wage for each individual hour of work). At least five other circuits, however, have adopted the weekly-wage standard. *See Worsham v. B.G. Prop. Mgmt., LLC*, No. 4:16-cv-2712, 2020 WL 7353906, at *12 (S.D. Tex. Sept. 4, 2020) (collecting cases), *report and recommendation adopted*, 2020 WL 6784217 (S.D. Tex. Nov. 18, 2020). "District courts in the Fifth Circuit that have considered the issue have also adopted the weekly wage standard." *Id.* (collecting cases). *Cf. Mornford v. Andrews*, 151 F.2d 511, 511 (5th Cir. 1945) ("An employee may be paid a fixed amount each week, provided it is an amount sufficient to cover the minimum wages . . . ."). Importantly, Defendants advocate for this weekly-average standard, and Plaintiff does not argue that the hourly-wage standard should apply. Thus, the Court will apply the weekly-average standard for the purposes of this Order.

An exception to the minimum-wage obligation is the "tip credit" exception. Under that exception, employers may "pay less than the general minimum wage—$2.13 per hour—to a 'tipped employee' as long as the employee's tips make up the difference between the $2.13 minimum wage and the general minimum wage." *Montano v. Montrose Restaurant Assocs., Inc.*,

800 F.3d 186, 188 (5th Cir. 2015). To utilize the tip-credit exception, employers must comply with the notice provision of 29 C.F.R. § 531.54(c). An employer is not required to utilize the tip-credit exception.

Plaintiff alleges that Defendants did not pay her (and the purported collective) either the general minimum wage or the $2.13 minimum wage. (Doc. No. 23 at 7). In fact, she alleges that she was never paid *any* wages, compensated only through tips from Defendants' customers. (*Id.*). While Defendants do not dispute that they did not pay their employees a set hourly rate, they contend that they used mandatory service charges—not tips—to satisfy the FLSA minimum-wage obligations. (Doc. No. 39 at 8). The issues, therefore, are whether the use of service charges to pay Plaintiff was lawful and whether, calculated using the weekly-wage standard, Plaintiff was paid at least the minimum wage.

A tip is defined as follows:

> A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for the customer. It is distinguished from payment of a charge, if any, made for the service. Whether a tip is to be given, and its amount, are matters determined solely by the customer.

29 C.F.R. § 531.52(a).

On the other hand, "[a] compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip." *Id.* § 531.55(a). Such services charges must be "part of the employer's gross receipts" and "may be used in their entirety to satisfy the monetary requirements of the Act." *Id.* § 531.55(b). In sum, if employees were paid through tips, Defendants needed to still pay them $2.13 an hour and inform them of such policies; but if they were paid through service charges, they did not.

In her affidavit, White sets out that Nomad has, since its inception, always added a mandatory service charge onto customers' bills (initially 15%, but now 18%), and such service

charges have always been a part of Defendants' gross receipts or money that belongs to them. (Doc. No. 39-2 at 2). She further swears that these service charges were mandatory, never taken off a customer's bills, different from and additional to discretionary tips, and used to pay the general minimum wage. (*Id.* at 2, 5).

Plaintiff, in response, makes two arguments. First, she claims that, contrary to Defendants' position, the mandatory services charges were not implemented until late 2021. (Doc. No. 43 at 11). As such, she argues, Defendants could not have relied on the service charges to satisfy their minimum-wage obligations and needed to have paid their employees $2.13 per hour and informed them of the tip-credit policies. (*Id.*). She supports that allegation with sworn affidavits of other employees. *See* (Doc. Nos. 43-2, 43-3, 43-4). While that factual discrepancy may raise a *genuine* fact issue, that fact issue is not *material* because Plaintiff herself did not start working for Defendants until August 2022—almost a year after the service charges were implemented, even by Plaintiff's version of events. (Doc. No. 43-1 at 2) (Pl.'s Decl.). Plaintiff, who started in August 2022, cannot challenge a compensation policy of her employer that ended in September 2021, almost a year before she began. Importantly, Plaintiff's own affidavit acknowledges the use of an "automatic gratuity." (Doc. No. 43-1 at 3). While she labels this a "tip," in addition to cash and credit card tips, the fact that they are "automatic" means they do not qualify as tip under the relevant regulations. § 531.52(a) ("Whether a tip is to be given, and its amount, are matters determined solely by the customer."); § 531.55(a) ("A compulsory charge for service . . . imposed on a customer by an employer's establishment, is not a tip."). Therefore, Plaintiff fails to raise a genuine issue of material fact on the illegality of Defendants' use of mandatory service charges to compensate her.

The Court acknowledges that some of the purported collective members who have already filed their consents to join the collective did work for Defendants prior to the late-2021 addition of service charges. *See* (Doc. Nos. 43-2, 43-3, 43-4). It is these individuals' affidavits that raise a fact issue on when the service charges were implemented. Nevertheless, these individuals are not properly joined as plaintiffs or as collective members. Though their consents were obtained well before filing of the Second Amended Complaint, *see* (Doc. Nos. 8, 15, and 22),[1] that Complaint fails to name any of them, *see generally* (Doc. No. 23). Moreover, the Court has not ruled on Plaintiff's Motion to Conditionally Certify a FLSA Collective Action, (Doc. No. 44), filed while this Motion for Summary Judgment was already pending. Indeed, a prerequisite to proceeding as an FLSA collective action is this Court's determination that the putative collective members are "similarly situated." 29 U.S.C. § 216(b); *Swales v. KLLM Transport Servs., LLC*, 985 F.3d 430, 443 (5th Cir. 2021) (holding that the "FLSA's similarity requirement is something that district courts should rigorously enforce," which may lead to a determination that "the case cannot proceed on a collective basis"). The Court has made no such determination, and thus, no collective has been formed yet. In fact, the difference in the employment dates of the putative collective members may make that determination difficult to reach.

To be sure, FLSA's collective action section provides that "[n]o employee shall be a party plaintiff to any such actions unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought," 29 U.S.C. § 216(b), which is what happened here. That, however, merely sets out a prerequisite to join a collective action. It does not make a person a plaintiff. To hold that mere consent is sufficient to form a collective would be to authorize plaintiffs to unilaterally form a collective action without the Court's approval. Thus,

---

[1] Edgar Leal's and Aaliyah Leday's Notices of Consent were signed on September 30, 2023, and Sabrina Marquez's was signed on November 13, 2023. The Second Amended Complaint, however, was filed November 21, 2023.

7

these "opt-in" members were neither joined as plaintiffs under Rule 20(a)(1)(B) nor collective members under § 216. Consequently, the fact that their employment may predate the alleged implementation of the service charges in 2021 raises no genuine issue of material fact.

Second, Plaintiff argues that "Defendants did not pay Plaintiff[] a direct cash wage of $2.13 per hour, nor did they inform Plaintiff[] of the FLSA's tip credit provisions." (Doc. No. 43 at 11). "Additionally, Defendants allowed Plaintiff['s] tips to be shared with non-tipped personnel . . . ." (*Id.*). The latter argument regarding tip-sharing, though made under the header about minimum or overtime wages, relates to a different cause of action asserted by Plaintiff, not relevant here and is discussed in more detail below. With regard to the former, as explained above, the $2.13-an-hour requirement only applies if an employer *chooses* to take a tip credit towards its minimum wage obligations. An employer could just as lawfully choose to pay the $7.25 minimum and do so using the mandatory service charges. *See* § 531.55(b) (service charges "may be used in their entirety to satisfy the monetary requirements of [FLSA]"). That is what Defendants' COO swears happened here, *see* (Doc. No. 39-2 at 5), and Plaintiff points to no evidence that Defendants chose, instead, to take a tip credit towards its minimum wage obligations.

The remaining issue, therefore, is whether the wages given solely through the service charges were sufficient. The record shows they were. White's affidavit states that she calculated Plaintiff's wages paid through the service charges by reviewing the time records and sales summaries for the relevant time period. (Doc. No. 39-2 at 5). Her method was to take 18% of the net sales on a given day (*i.e.*, the service charge) and divide that service charge by the number of servers on that day and further divide that by the hours worked by Plaintiff. (*Id.*). The result is that, throughout the entirety of her employment, Plaintiff was paid a weekly average ranging from no less than $14.23 an hour and up to $331.83 per hour. *See* (Defs.' Ex. 24 at 12–16) (provided to the

8

Court via USB drive). At no point during her employment was she paid below $7.25 through the service charges.

Plaintiff does not point to any evidence that contradicts this math. Instead, Plaintiff concedes that she "received a percentage of credit card tips and a share of the automatic gratuity." (Doc. No. 43-1 at 3). That share of the automatic gratuity, the uncontroverted record shows, far exceeded the minimum wage. As such, summary judgment is **GRANTED** as to the minimum wage claim.

### B. Failure to Pay Overtime Wages under 29 U.S.C. § 207

FLSA mandates that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

There exists an exception to the FLSA overtime rule. The exception—the *de minimis* rule— "provides that an employer, in recording working time, may disregard insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes." *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 414 (5th Cir. 2011). In analyzing whether an activity is *de minimis*, courts look to several factors: "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Id.* at 415. This test "reflects a balance between requiring an employer to pay for activities it requires of its employees and the need to avoid split-second absurdities that are not justified by the actuality of the working conditions." *Id.*

Here, Defendants point to White's affidavit, which states that she calculated the overtime worked by Plaintiff by compiling her time records. (Doc. No. 39-2 at 5). White also attaches her calculations. *See* (Defs.' Ex. 25 at 6–7) (provided to the Court via USB drive). That exhibit shows that, in the year Plaintiff worked for Defendants, she worked overtime in only two week-long periods: once on the week of October 9, 2022, and another on the week of November 27, 2022. In the former, she worked 0.1 hours (*i.e.*, six minutes) overtime. In the latter, she worked 6.33 hours (*i.e.*, six hours and twenty minutes) overtime.

On the other hand, Plaintiff points to her affidavit, which states that her "typical work schedule was 5-6 days a week, Sunday through Saturday. [She] almost always worked 8.5-10 hours per day and routinely worked 45-55 hours per week." (Doc. No. 43-1 at 4). It also states that she was not paid the "one-and-a-half times what would have been at least [her] hourly pay . . . for the hours that [she] worked over 40 during any given week." (*Id.*). These battling affidavits create a genuine and material fact issue that must be resolved by a factfinder, and thus, makes summary judgment.

Defendants spill a great deal of ink on two issues, both of which are inapplicable here. First, they argue that Plaintiff has not satisfied the *Mt. Clemens* standard. The *Mt. Clemens* standard provides that "[a]n employee bringing an action for unpaid overtime compensation must first demonstrate by a preponderance of the evidence: (1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due." *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014) (citing *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005)). "Once the employee establishes a prima facie case, the

burden then shifts to the employer to 'come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Id.* (citing *Harvill*, 433 F.3d at 411).

That rule, however, does not apply here. The Supreme Court in *Mt. Clemens* faced a concern that "FLSA's recordkeeping regime may inadvertently incentive employers to fail to keep proper records because those records because those records may later aid a plaintiff in proving overtime liability." *Flores v. FS Blinds, L.L.C.*, 73 F.4th 356, 362 (5th Cir. 2023) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). "Such a perverse incentive would 'penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.'" *Id.* (quoting *Mt. Clemens*, 328 U.S. at 687). "To alleviate this concern, the Supreme Court *in Mt. Clemens* created a burden-shifting rule *that applies when an employer has failed to keep records, or where such records are 'inaccurate or inadequate.*" *Id.* (citing *Mt. Clemens*, 328 U.S. at 687) (emphasis added). There is no allegation or evidence that Defendants failed to keep records or that their records are inaccurate or inadequate, and thus, the *Mt. Clemens* burden-shifting framework does not apply.

The second issue Defendants raise is whether the overtime hours worked by Plaintiff were *de minimis*. In fact, they argue that the overtime hours worked by Plaintiff were *de minimis* as a matter of law. The flaw in that argument is that, in arguing so, Defendants rely on *their* calculation of Plaintiff's overtime hours. At this stage of the litigation, however, the Court must credit Plaintiff's evidence, which states that she "almost always worked 8.5-10 hours per day and routinely worked 45-55 hours per week." (Doc. No. 43-1 at 4). Routinely working five to fifteen hours of overtime per week and tracking those hours via a computerized system weigh all three *de minimis* factors in Plaintiff's favor: "(1) the practical administrative difficulty of recording the

additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Chambers*, 428 F. App'x at 415. The overtime was easily recorded, substantial in aggregate, and regular. Therefore, summary judgment is **DENIED** on Plaintiff's overtime wages claim.

### C. Unlawful Taking of Tips in Violation of 29 U.S.C. § 203

Plaintiff alleges that Defendants allegedly required Plaintiff and other employees to participate in an illegal tip pool by requiring them to pool their tips and taking a portion of those tips to pay other employees who do not customarily and regularly receive tips. (Doc. No. 23 at 21).

The FLSA provides that "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." 29 U.S.C. § 203(m)(2)(B); 29 C.F.R. § 531.52(b). An important exception is "tip pooling": "An employer does not violate [FLSA's] prohibition against keeping tips if it requires employees to share tips with other employees who are eligible to receive tips," and collects and distributes the tips as a part of that tip pool. 29 C.F.R. § 531.54(b)(1).

Tip pooling generally comes in two forms. First is for employers that take a tip credit. For such employers, tip pool must be "limited to employees who customarily and regularly receive tips." *Id.* § 531.54(c)(1). Moreover, the employer must: (1) "notify its employees of any required tip pool contribution amount"; (2) "may only take a tip credit for the amount of tips each employee ultimately receives"; and (3) "may not retain any of the employees' tips for any other purpose." *Id.* § 531.54(c)(2). The second form has fewer restrictions. Where, as here, an employer pays its tipped employees the full minimum wage and does not take tip credit, it "may impose a tip pooling arrangement that includes dishwashers, cooks, or other employees in the establishment who are

not employed in an occupation in which employees customarily and regularly receive tips." *Id.* § 531.54(d). Unlike for the first form of tip pooling, there is no notice provision. Under both forms, however, "[a]n employer may not receive tips from such a tip pool and may not allow managers and supervisors to receive tips from the tip pool." *Id.* § 531.54(c)(3), (d).

Plaintiff complains of three alleged violations of the tip-pooling regulation: (1) tip pooling with employees who do not customarily and regularly receive tips; (2) no notice of tip pooling; and (3) tip pooling with management. The first two do not survive summary judgment, even assuming Defendants operated a tip pool.[2] Those requirements come from the first form of tip pooling—for employers who take a tip credit. As explained above, Defendants did not take a tip credit. *See* (Doc. No. 39-2 at 5). As such, they were free to include in the tip pool "dishwashers, cooks, [and] other employees in the establishment who are not employees in an occupation in which employees customarily and regularly receive tips." *Id.* § 531.54(d). Moreover, for the same reason, they were not required to provide notices that Plaintiff alleges was lacking.

The third alleged violation does survive summary judgment because Plaintiff raises a genuine issue of material fact on whether management and supervisors partook in the tip pool. Plaintiff declares that "[t]hese tips were pooled together, and we had to share them with the owner, Bassam Nagra, as well as the bussers, security personnel, and the DJ. After they received their portions, the remaining amount was divided equally among the servers." (Doc. No. 43-1 at 3). Other former employees' affidavits state similarly: "The service charge, combined with credit card tips, was pooled together. A portion was deducted for Defendants, bussers, expos, security, and the DJ, and the remaining amount was distributed equally among the servers." (Doc. Nos. 43-2 at 3;

---

[2] White testifies that Defendants never operated a tip pool, and instead, distributed *service charges*, which were monies owned by Nomad and, thus, Nomad was free to distribute as it saw fit. (Doc. No. 39 at 13) (citing Doc. No. 39-2 at 2–3). Nevertheless, Plaintiff's affidavit states that "tips were pooled together," along with service charges, (Doc. No. 43-1 at 3), and at this stage of the litigation, the Court must weigh the evidence in Plaintiff's favor.

43-3 at 3; 43-4 at 3). Such evidence in the record suffices to raise a genuine issue of material fact on whether management and supervisors took shares of the tip pool in violation of § 531.54(d). Therefore, the Court **DENIES** summary judgment as to Plaintiff's unlawful tip-pooling claim.

### D. Kickbacks and Forced Tipping in Violation of 29 C.F.R. § 531.35

Plaintiff alleges that Defendants' forcing of Plaintiff to pay fees to other employees violate the "free and clear" requirement of 29 C.F.R. § 531.35. Title 29, Code of Federal Regulations, § 531.35 states that "'wages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.'" 29 C.F.R. § 531.35. That is, the regulation prohibits "kickbacks" from the employee "directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee." *Id.* The example provided in the regulation is illuminating. It reads, "if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular function, there would be a violation of the Act . . . ." *Id.*

No such "kickback" occurred here. The basis of Plaintiff's claim is that a part of the tips and service charges were pooled and then distributed to Defendants' employees. Nowhere does Plaintiff contend or, more importantly, provide evidence that the *distributed* tips and service charges—the wages—were then *re*-pooled and/or used to pay Defendants or other employees— the "kickback." The uncontested evidence demonstrates that, when wages were distributed, that distribution was final and free and clear. Pre-distribution deductions do not state a claim for violations of this section. Plaintiff reads § 531.35, in effect, to prevent tip pooling, but tip pooling is expressly authorized by the regulation, in the adjacent section. *See id.* § 531.54. Such a

contradictory reading of the regulation cannot be sound. Consequently, the Court **GRANTS** summary judgment on Plaintiff's kickback claim.

### E. Retaliation

Plaintiff alleges that "[s]ince the filing of Plaintiff's Original Complaint on September 11, 2023, Defendants have, directly and through third parties, harassed, threatened and intentionally retaliated against several [purported] Collective Members." (Doc. No. 23 at 22). After Defendants moved for summary judgment on this claim, however, Plaintiff has completely failed to defend it in her response or even the sur-reply to the Motion for Summary Judgment. In fact, she does not mention retaliation once in those briefs. Once Defendants moved for summary judgment, the burden shifted to provide evidence that, at least, raises fact issues on the claim. *See Celotex*, 477 U.S. at 321–25. She failed to do so. As such, the Court **GRANTS** summary judgment on Plaintiff's retaliation claim.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment. (Doc. No. 39). Summary judgment is **GRANTED** as to Plaintiff's minimum wage claim, kickback claim, and retaliation claim. Summary judgment is **DENIED** as to Plaintiff's overtime wages claim and unlawful tip-pooling claim,

It is so ordered.

Signed on this the 12th day of May, 2025.

Andrew S. Hanen
United States District Judge